IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| F.L.G., | : |
|     **Plaintiff,** | : |
|     v. | :    Case No. 5:21-cv-00133-CHW |
| **COMMISSIONER OF SOCIAL SECURITY,** | :    Social Security Appeal |
|     **Defendant.** | : |

## ORDER

This is a review of a final decision of the Commissioner of Social Security denying Plaintiff F.L.G.'s application for disability benefits. The parties consented to have a United States Magistrate Judge conduct all proceedings in this case, and as a result, any appeal from this judgment may be taken directly to the Eleventh Circuit Court of Appeals in the same manner as an appeal from any other judgment of the United States District Court. Because substantial evidence supports the Commissioner's decision, the decision in Plaintiff's case is **AFFIRMED**.

## BACKGROUND

Plaintiff applied for Title II and Title XVI disability benefits on January 5, 2018, alleging disability beginning on July 4, 2016, based on the following impairments: thyroid disorder, anxiety disorder, high blood pressure, mycobacterium avium complex, human papillomavirus, depression, and lung disorder. (Ex. 1A, 2A). Her date last insured (DLI) was December 31, 2021. (R. 71, 89). After Plaintiff's applications were denied initially and on reconsideration at the state agency level of review (Exs. 1A, 2A, 5A, 6A), Plaintiff requested further review before an administrative law judge (ALJ). The reviewing ALJ held a telephonic hearing on July 14, 2020, where Plaintiff was

represented by counsel. (R. 35-67). The ALJ issued an unfavorable opinion on September 14, 2020. (R. 14-33). Plaintiff's request for review of that decision by the Appeals Council was denied on February 16, 2021. (R. 1-6). The case is now ripe for judicial review. *See* 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

Judicial review of a decision of the Commissioner of Social Security is limited to a determination of whether that decision is supported by substantial evidence, as well as whether the Commissioner applied the correct legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). "Substantial evidence" is defined as "more than a scintilla," and as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* The Eleventh Circuit has explained that reviewing courts may not decide the facts anew, reweigh the evidence, or substitute their judgment for that of the Commissioner. *Id.* Rather, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if the evidence preponderates against it.

## EVALUATION OF DISABILITY

Social Security claimants are "disabled" if they are unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations outline a five-step sequential evaluation process for determining whether a claimant is disabled: "(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of impairments; (4) based on a residual functional capacity ("RFC") assessment,

whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's RFC, age, education, and work experience." *Winschel*, 631 F.3d at 1178 (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v); 416.920(a)(4)(i)-(v)).

## MEDICAL RECORD

Plaintiff treated at WellStar West Georgia Medical Center on several occasions. In August 2017, Plaintiff presented to the emergency department (ED) with an infection on her left heel. (R. 430). She showed no respiratory distress at this visit. (R. 429). In December 2017, Plaintiff visited the ED after coughing up blood, which led to her being admitted to the hospital where testing showed that Plaintiff may again have tuberculosis (TB). (R. 463-466, 467). Plaintiff disclosed a prior TB diagnosis and treatment from 2003 and previous testing in 2011 that revealed scarring in her lungs. (R. 477). Given Plaintiff's history and the results of various testing, treatment providers placed Plaintiff on medications for suspected TB and upon discharge referred her to the health department for further treatment. (R. 464, 477). Plaintiff complied with visiting the health department. (Ex. 2F). She was also given discharge instructions to follow-up with Dr. Fidahussein, who consulted on Plaintiff's case in the ED. (R. 465, 482-484). Testing eventually showed that Plaintiff had mycobacterium avium complex (MAC). (R. 370). Following her MAC diagnosis, Plaintiff received long term antibiotics at the hospital through a PICC line under the supervision of Dr. Fridahussein. (R. 420, 426-427).

The record includes another ED visit from March 2018, when EMS transported Plaintiff to the ED for suicidal ideations. (R. 534). Plaintiff denied having any such ideations, but she stated she had been drinking. (*Id.*, R. 536). The physical exam at this visit showed breathing with normal effort and normal breath sounds. (R. 536).

Plaintiff treated with Dr. Fidahussein following discharge from her December 2017 hospitalization and continued treating with him until at least 2019. At her first appointment in January 2018, Plaintiff reported a continuing cough and feeling tired. (R. 543). Dr. Fidahussein opined that Plaintiff would likely need surgical and chemical treatment based upon her lab work and ongoing treatment. (*Id.*) During the physical examination, Plaintiff showed a cough and shortness of breath without any wheezing. (R. 544). In February 2018, Plaintiff reported no side effects from the antibiotic treatment. (R. 719). Dr. Fidahussein ordered monthly AFB smears for Plaintiff until negative results were received. (*Id.*)

In March 2018, when Plaintiff reported ringing in her ears, Dr. Fidahussein stopped Plaintiff's treatment at eight weeks after she finished the final infusions of amikacin. (R 531, 712). She was noted to be anxious. (R. 712). Plaintiff had no wheezing or other respiratory distress at this appointment. (R. 713). Because her AFB smear was negative, Dr. Fidahussein referred Plaintiff for surgery in the event her AFB cultures were also negative. (R. 713-714). He also encouraged Plaintiff to get a second opinion at Emory regarding her MAC treatment. (R. 714). At her April 2018 appointment, Plaintiff reported increased tinnitus and indigestion and reflux. (R. 719). She also reported coughing to the point of vomiting. (*Id.*) Plaintiff had decided against going to Emory. (*Id.*) She showed no respiratory distress during the physical exam. (R. 720).

Plaintiff was admitted to a WellStar hospital in Marietta for four days in May 2018 for a bronchoscopy, lysis of adhesions, and right upper lobectomy. (Exs. 9F, 10F, 18F, R. 1010-1026). Post-operative notes indicated Plaintiff tolerated the procedures well (R. 998, 1002), but then she had "a severe and unrelenting cough," showed decreased breath sounds on her right side, and reported being unable to lie flat to sleep at a post-op appointment. (R. 949, 951). Notes also indicate Plaintiff expressed being anxious. (R. 1013). Chest x-rays later showed improvement during her

4

post-op care when compared to those immediately after surgery. (R. 949). Following the procedure, Plaintiff's diagnoses were MAC, cavitary mass in the apex of the right upper lobe, and complete pleural symphysis. (R. 1001).

Plaintiff visited Dr. Fidahussein in May 2018, where she reported chest pain and tenderness. (R. 962). The physical exam also noted shortness of breath and fatigue. (*Id.*) Plaintiff did not report any sleep disturbances. (*Id.*) Dr. Fidahussein continued the monthly check of Plaintiff's AFB because the latest sputum was positive. (R. 964). In June 2018, Plaintiff demonstrated severe chest pain which was tender to the touch. (R. 970). Dr. Fidahussein opined that the tenderness may be related to a fracture. (*Id.*) Plaintiff's pain and cough continued at her August 2018 appointment, although the physical exam demonstrated normal breath sounds. (R. 974-975). Dr. Fidahussein again encouraged Plaintiff to visit Emory for a second opinion. (R. 995).

Plaintiff visited Dr. Sueblinvong at Emory Healthcare for a consultation on August 30, 2018. (Ex. 13F). Plaintiff complained only of chest pain and digestive issues. (R. 982). After reviewing Plaintiff's history, Dr. Sueblinvong stated that he was not sure about the cause of Plaintiff's pleuritic chest pain, but he associated it with either a post-surgical musculoskeletal or pleural issue. (R. 983). He suggested a nerve block to treat the pain or returning to the surgeon for the rib-related instability issues. (*Id.*)

At an early October 2018 appointment with Dr. Fidahussein, Plaintiff's rib pain had stopped. (R. 989). She denied any nausea, vomiting, or chest pain, but continued to complain of cough and shortness of breath. (R. 989, 991). By late October 2018, Plaintiff received a negative culture, and her tinnitus was improved. (*Id.*, R. 990). Records from this visit show that the June AFB culture had also returned negative. (R. 992, 997). Plaintiff reported continuing to take

azithromycin, rifabutin, and ethambutol. (R. 989). Treatment plan notes indicated that if the cultures remained negative, her last treatment would July 2019. (R. 990).

Notes from the July 2019 appointment indicate that Plaintiff's cough continued, but any related phlegm remained clear. (R. 1171). Plaintiff reported "no side effects or adverse events" but expressed being under some stress. (*Id.*) Her physical exam again showed no respiratory distress. (R. 1172). Dr. Fidahussein noted Plaintiff's significant improvement with Breo and albuterol and discussed decreasing the Breo dosage at Plaintiff's next visit. (R. 1173). Plaintiff's MAC medications were continued, and Dr. Fidahussein advised Plaintiff to stop smoking. (*Id.*).

The last visit from Dr. Fidahussein in the record is from December 2019, at which point Plaintiff's cultures had been negative for one year. (R. 1177, 1180). Plaintiff reported feeling much better with improved asthma symptoms. (R. 1180). Due to increased GERD symptoms, Dr. Fidahussein suggested Plaintiff resume taking omeprazole. (*Id.*) Dr. Fidahussein stepped-down Plaintiff's Breo dosage and changed her albuterol to be used as needed. (R. 1181). Plaintiff's last treatment for MAC was projected to be in January 2020. (R. 1182).

Plaintiff also treated with other providers for symptoms related to MAC and its treatment. In February 2018, Plaintiff visited an ENT after having trouble breathing through her nostrils (Ex. 6F). Plaintiff was recommended for a nasal septoplasty. (R. 524). She also mentioned the ringing her ears as a complication of her MAC treatment. She requested a hearing test, but she denied having any hearing problems. (R. 523). Also in February 2018, Plaintiff visited Dr. Lori Dulabon at West Georgia Urology for a consultation regarding her urinary incontinence symptoms. (R. 493). Plaintiff reported increased incontinence since being on hydrochlorothiazide. (*Id.*) The visit notes list Plaintiff as a smoker. (R. 494). An in-office test showed no infection. (R. 497). Dr.

6

Dulabon diagnosed Plaintiff with urinary incontinence and dysuria and gave Plaintiff several medications to try before choosing the best course of treatment. (R. 497-498).

*Consultative Examinations*

During her application process, in July 2018, Plaintiff underwent pulmonary function testing (PFTs) with a state agency. (Ex. 11F). Plaintiff was not ill, wheezing, or febrile during the testing. (R. 970). The state agency reviewers determined that the results of the PFTs were not valid to meet a listing. *See* (R. 85, 98).

Plaintiff also visited Dr. Rebecca Stephens for a consultative psychiatric examination. (Ex. 16F). Plaintiff reported being unable to work in finance because she cannot breathe most of the time, has anxiety, and cannot sleep at night. (R. 1109-1110). Plaintiff explained that she had experienced anxiety before her MAC diagnosis and became "increasingly anxious" and depressed after the diagnosis. (R. 1110). She attributed her sleep issues to her MAC diagnosis and complications, because coughing keeps her up and she must sleep sitting up. (*Id.*)

Plaintiff reported that she lived with her boyfriend and younger son. (R. 1109). When asked about her daily activities and functioning, Plaintiff explained that she coughs to clear her lungs for 90 minutes after waking up. (R. 1111). Shortness of breath and asthma attacks keep Plaintiff from completing household chores. (*Id.*) Any shopping is done online because going to stores is "too much for her." (*Id.*) She drives very little. (*Id.*) Plaintiff is only able to take baths, and her boyfriend helps wash her hair. (*Id.*) She reported no issues managing money. (*Id.*) Plaintiff explained that she does not have close friends but gets along well with others. (*Id.*) Dr. Stephens found Plaintiff to have average intelligence. (*Id.*) Dr. Stephens described Plaintiff's mood as anxious but found that any depression expressed by Plaintiff was a normal reaction to life events rather than clinical depression. (R. 1112).

Dr. Stephens also interviewed Plaintiff's boyfriend. (R. 1111). He described Plaintiff's difficulty sleeping, anxiety, and general fear of what to expect. (*Id.*) He explained that she does have difficulty breathing and has to rest. (*Id.*) He stated that Plaintiff does a few things around the house and helps to run the front desk at his dentist office most days. (*Id.*, R. 1112).

Overall, Dr. Stephens assessed Plaintiff with a fair prognosis regarding her mental health. (*Id.*) Although he noted Plaintiff's anxiety, Dr. Stephens found that Plaintiff could learn and carry out complex tasks. Although she worked in her boyfriend's dental office despite the physical limitations she described, Dr. Stephens suggested that, given her relationship, she was not expected to be at work every day and was allowed certain accommodations, but that she might still "have some difficulty with stress." (*Id.*)

*Function Reports*[1]

Plaintiff completed a function report as part of her benefits application process. (Ex. 7E). She stated that walking leaves her unable to breathe and that she spends her day "trying to breath[e]." (R. 287-288). She stated that she got no sleep and that her condition leaves her unable to do any of the things she did before she was ill. (R. 288, 291). She needs help remembering to take her medications and does not prepare meals. (R. 289). She does no housework and never goes outside. (R. 289-290). She attributes her physical limitations to her inability to breathe. (R. 290-292). Her condition limits each activity listed on the report except for talking. (R. 292). She stated that she uses a walker and wheelchair every day. (R. 293). She denied being able to pay bills, count change, manage a savings account, or use a checkbook. (R. 290). Despite the limitations she places on herself, Plaintiff stated that she can handle stress and changes in her routine. (R. 293).

---

[1] The ALJ's decision references a third-party function report completed by Plaintiff's boyfriend, James Tyrer (R. 22-23), but Court found no separate report in the record. Neither party contests the ALJ's summary of Mr. Tyrer's reporting. To the extent necessary to complete its review, the Court has considered the ALJ's summary and Dr. Stephens's summary of the third-party function report.

8

*Hearing Testimony*

Plaintiff testified at the hearing before the ALJ about her history and general condition. She outlined her daily medications and stated that she feels her medications do not work well, which causes her to use them more frequently. (R. 46-47). Plaintiff described using a nebulizer every four hours, which takes about 30-45 minutes away from her routine or activities. (R. 49-50). She stated that she no longer drives or shops in stores because she experiences anxiety. (R. 45-46). She explained that she stopped working in July 2016 because of a persistent cough and fatigue and because increased anxiety made it difficult to be around others. (R. 45, 47-48). Plaintiff does not believe that she could work in a typical office environment because being around people all the time is difficult, her coughing leads to uncontrolled urination and occasional vomiting, she would be unable to walk short distances, and she would need to take frequent breathing treatments. (R. 49, 55, 60).

Plaintiff described her past medical procedures and belief that her breathing is worse now. (R. 51). She stated that her doctors recommended doing whatever activity she could tolerate following her treatment. (R. 53). Her current treatment plan involves visiting her doctor every six months to monitor her condition and medications. (R. 57). Plaintiff explained that cooking and cleaning were difficult and that she rests throughout the day. (R. 53-54). She described being able to walk only 15 steps and only standing five minutes before needing to rest. (R. 54-55). Plaintiff denied being able to sit very long because she would need to get up to go to the restroom or take care of any issues caused by coughing or an asthma attack. (R. 55). She explained that her physical ailments lead to her having anxiety attacks, which she experiences even at home. (R. 56-57). She described experiencing anxiety symptoms around ten times per day. (R. 57). She stated her current anxiety medication helps manage her condition "a little bit." (R. 57-58).

## DISABILITY EVALUATION

Following the five-step sequential evaluation process, the reviewing ALJ made the following findings in this case. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 4, 2016, the alleged onset date. (R. 19). Plaintiff's date last insured was December 31, 2021. (*Id.*) At step two, the ALJ found that Plaintiff suffered from the following severe impairments: "asthma, pulmonary mycobacterium avium complex (MAC), and anxiety/panic disorder." (*Id.*) The ALJ found that Plaintiff's insomnia and hypertension impairments were non-severe. (R. 20). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments meeting or medically equaling the severity of one of the listed impairments. (*Id.*) Therefore, the ALJ assessed Plaintiff's RFC and determined that Plaintiff could perform light work, with the following limitations:

> The claimant can lift/carry up to 20 pounds occasionally and 10 pounds frequently. She can stand/walk/sit for up to six hours in an 8-hour workday with normal breaks. The claimant requires the option of alternating between sitting and standing during the workday, at intervals of 30 minute to 1-hour. The claimant is unable to climb ladders, ropes, or scaffolds; however, she can occasionally climb ramps and stairs. The claimant can engage in occasional stooping, kneeling, crouching, crawling, or balancing activities. She must avoid concentrated exposure to irritants or chemicals, and she must avoid concentrated exposure to unprotected heights and hazardous machinery. The claimant is limited to simple, type routine jobs, which do not involve fast-paced, production type work, and which require her to make only simple work-related decisions, with few, in any workplace changes. The claimant can occasionally interact with the public, co-workers, and supervisors. The claimant is likely to be "off task' no more than 5% of a normal workday.

(R. 23-24).

Based on this RFC, the ALJ found at step four that Plaintiff was unable to perform her past relevant work as a loan officer. (R. 26). At step five, the ALJ determined that there are jobs existing which Plaintiff can perform, including collator operator, marker, and router. (R. 27). As a result, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. (*Id.*)

## ANALYSIS

In her appeal, Plaintiff raises one enumeration of error, asserting that the ALJ should have re-contacted Plaintiff's treating physicians for their opinions or referred Plaintiff for a physical consultative exam because the record inadequately addressed Plaintiff's limitations and arguing that she was prejudiced as a result. (*Id.,* p. 7-11). As discussed below, the record before the ALJ was sufficient to determine Plaintiff's claims, and the ALJ was under no duty to develop the record further. The resulting RFC is supported by substantial evidence.

There are two competing duties in Plaintiff's case. Plaintiff, as a claimant, "bears the burden of proving the [she] is disabled, and, consequently, [she] is responsible for producing evidence in support of [her] claim." *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); 20 C.F.R. §§ 404.1512 and 416.912. An ALJ has a duty to develop a full and fair record regardless of a claimant's representation. *Brown v. Shalala*, 44 F.3d 931, 934 (11th Cir. 1995). This duty arises because "a hearing before an ALJ is not an adversary proceeding." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). When a claimant is unrepresented, the duty to develop the record becomes a special duty. *Brown*, 44 F.3d at 934. In this case, Plaintiff was represented at the hearing. *Id.*, (R. 17).

A violation of the "duty to fully develop the record…only necessitates a remand if 'the record reveals evidentiary gaps which result in unfairness or clear prejudice.'" *Mosley v. Acting*

*Comm'r of Soc. Sec. Admin.*, 633 F. App'x 739, 742 (11th Cir. 2015) (citing *Brown*, 44 F.3d at 935). Prejudice requires a showing that "'the ALJ did not have all of the relevant evidence before [her] in the record (which would include relevant testimony from [the] claimant), or that the ALJ did not consider all of the evidence in the record in reaching [her] decision.'" *Mosley*, 633 F. App'x at 742 (citing *Kelley v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985)). The record before the ALJ reveals no evidentiary gaps, and Plaintiff cannot make the necessary showing of unfairness or prejudice.

A duty to develop a full and fair record does not alleviate Plaintiff's burden to establish that she is eligible for benefits. *See Ingram v. Comm'r of Soc. Sec. Admin*. 496 F.3d 1253, 1269 (11th Cir. 2007). At the hearing, Plaintiff, through counsel, confirmed the exhibits submitted to ALJ and that the record was complete. (R. 41-42). Plaintiff concedes that the absence of opinions from a treating or examining source is not itself error. (*Id*., p. 8). As the ALJ considered all the evidence in the record, Plaintiff must show some relevant evidence or other evidentiary gap that prejudiced Plaintiff. Plaintiff has not argued that the ALJ incorrectly assessed any portion of the record. Instead, Plaintiff argues that she was prejudiced because "the record lacked any opinions of Plaintiff's physical limitations from a treating or examining source" and thus was insufficient to allow the ALJ to develop an RFC. (Doc. 21, p. 8-9).

Social Security regulations contemplate recontacting treating providers or ordering a consultative exam where evidentiary gaps exist or doing so is necessary to make an informed decision because of inconsistencies in the record. *See* 20 C.F.R. §§ 404.1520b(b) and 414.920b(b). The regulations do not require the Commissioner to seek out this additional information, however. Instead, the regulations state that the agency may recontact treating providers or order a consultative exam if the agency determines it cannot reach a decision or needs additional

clarification. *Id.*; *see also Jones v. Soc. Sec. Admin., Comm'r*, 857 F. App'x 587, 591 and n.1 (11th Cir. 2021) (discussing and recognizing the permissive versus mandatory nature of these regulations); *Ingram*, 496 F.3d at 1269 (explaining "a consultative exam is not required if the record contains sufficient evidence for the [ALJ] to make an informed decision"). The ALJ in this case was able to reach an informed decision based on the record as it existed at the time of hearing.

In developing the RFC, the ALJ thoroughly discussed the record, which included state agency physician reviews, function reports, medical records, consultative exams, and Plaintiff's testimony. In finding that Plaintiff's subjective symptoms were not entirely consistent with the record, the ALJ recognized Plaintiff's past TB diagnosis and the most recent MAC diagnosis, surgery, and treatment. (Doc. 24-25). The ALJ also discussed Plaintiff's consultative appointment with Dr. Sueblinvong at Emory, at which Plaintiff primarily complained of chest pain. (R. 982). The ALJ considered the psychological consultative exam from Dr. Stephens and found it persuasive because it was supported by the objective medical record. (R. 25-26). The ALJ also found the state agency assessments persuasive in terms of the entire record, including Plaintiff's boyfriend's description of Plaintiff's abilities and Plaintiff's work activity in his dental practice. (R. 26). Plaintiff testified thoroughly about her abilities and limitations at the hearing, which the ALJ described in the decision along with a summary of the arguments Plaintiff's counsel offered to the ALJ. (R. 24).

These records gave the ALJ information about Plaintiff's conditions, treatment, and limitations sufficient to support a decision. As the ALJ explained, the RFC was "based on the medical record, which shows evidence of shortness of breath, fatigue, depression, and anxiety." (R. 26). There is nothing to suggest that the record was incomplete or that the ALJ needed more information to reach a decision such that she failed to fulfill her duty to develop a full and fair

record. Plaintiff argues that the suggested additional records *might* have changed the outcome or *might* cause a reasonable factfinder to conclude she was eligible for benefits. (Doc. 21, p. 10) (emphasis added). But this suggestion of prejudice is at best speculation, and speculative prejudice cannot support a remand of Plaintiff's case. *See*, *e.g., Kelley*, 761 F.3d. at 1540. The ALJ fulfilled her duty to develop a full and fair record, and her decision thoroughly considered the record and articulated the decision based upon a sufficient record. Substantial evidence therefore supports the ALJ's decision, including the RFC.

## CONCLUSION

The ALJ did not fail to fulfill her duty to develop the record. The RFC and decision to deny benefits are supported by substantial evidence. The Commissioner's decision is **AFFIRMED**.

**SO ORDERED**, this 20th day of September, 2022.

s/ Charles H. Weigle
Charles H. Weigle
United States Magistrate Judge